## Case No. 5,567.

### GOODYEAR v. DAY.

Circuit Court, D. New Jersey. 1850.

PROVINCE OF JURY — FRAUD — GENERAL ISSUE—PLEADINGS—IMMATERIAL ISSUE — PATENTS—EXCLUSIVE LICENSE — SUIT FOR TARIFF — DEFENSES.

1. The jury must find the issues as presented, and assess the damages for the breach, if any, of the thing alleged. It makes no difference that it is an immaterial issue.

2. Where fraud is charged upon a party, in respect to his patent, it must be made out, at least prima facie.

3. Under a plea of the general issue, evidence may be introduced to show fraud or fraudulent representations on the part of the plaintiff as to the subject matter of the suit.

4. Where a patentee, G., gave to a person, D., an exclusive right or license to use his, G.'s, patented invention, for a certain consideration or tariff, G. agreeing, however, to take up and cancel all other licenses granted by him, and there being a covenant between G. and D., that in the event of others claiming grants and using such invention, and thereby impairing the profits which would accrue to D., that then such tariff would cease, *held*, in an action of covenant for non-payment of such tariff and other non-compliances, that it was a good defence that others used the invention and impaired the right of D., and that it was of no consequence whether G. was unable to restrain other parties from such use, or whether it was to his advantage or not to do so.

5. If a party, by his pleading, tender an immaterial issue, the jury must find the issue as presented, and assess damages for the breach, if any, of the thing alleged. It makes no difference that it is an immaterial issue.

Before GRIER, Circuit Justice.

## Case No. 5,568.

### GOODYEAR v. DAY.

[1 Blatchf. 565; [1] 1 Fish. Pat. Rep. 385.]

Circuit Court, S. D. New York. Oct. Term, 1850.

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

## Case No. 5,569.

### GOODYEAR v. DAY.

[2 Wall. Jr. 283; Merw. Pat. Inv. 655.] [1]

Circuit Court, D. New Jersey. Sept. 28, 1852.

PATENTS—PERPETUAL INJUNCTION—SENDING CASE TO JURY—WHO ENTITLED TO PATENT—REDUCING SPECULATION TO PRACTICE.

1. Where a court of equity, having heard a case on full proofs, is well satisfied of the originality of an invention, the regularity of a patent, and of the fact of infringement, it will not send the case to a jury to have its verdict prior to granting a perpetual injunction. It will grant it at once, especially if the questions in the case; though questions of fact, are of that kind that a court can decide them on the testimony of men of science, as well as, or better than a jury; and where a jury trial would be long, costly or troublesome.

[Cited in Buchanan v. Howland, Case No. 2,074; Roberts v. Reed Torpedo Co., Id. 11,910; McMillin v. Barclay, Id. 8,902; Wise v. Grand Ave. Ry. Co., 33 Fed. 278.]

---

[1] [Reported by John William Wallace, Esq. Merw. Pat. Inv. 655, contains only a partial report.]

2. It is not necessary for the protection of a patent, that the patentee should be the first person, who conceived the practicability or existence of the thing patented, but who, though making important experiments, was unable to bring them to any successful or valuable result. He who reduces speculation to practice, whose experiments result in discovery, and who then afterwards first puts the public into practical and useful possession of the compound, art, machine or product, is entitled to the patent right.

[Cited in Singer v. Walmsley, Case No. 12,900; Howe v. Williams. Id. 6,778; Jones v. Van Kirk, Id. 7,500; La Baw v. Hawkins, Id. 7,960; Moore v. Thomas, Id. 9,776; Yale Lock Manuf'g Co. v. Scovill Manuf'g Co., 3 Fed. 295; Washburn & Moen Manuf'g Co. v. Haish, 4 Fed. 905; Tucker v. Dana, 7 Fed. 214; Whittlesey v. Ames, 13 Fed. 893.]

[Cited in Lamson v. Martin, 159 Mass. 565, 35 N. E. 78.]

This was a case in equity for the infringement of a patent right in the manufacture of vulcanized India rubber. The bill prayed a perpetual injunction. The answer denied the allegations, and concluded by praying "a trial by jury of the various issues of fact formed by it." The argument involved many interesting inquiries; but facts were so interfused throughout the whole case, in the questions of law, that these last have not been found very capable of being reported. The pleadings were long; the proofs and exhibits very full, amounting to about 4000 printed pages; and they had been taken under an order, that they should be read either at law or in equity. The witnesses were numerous, and the questions were of a kind requiring much attention and intelligence. Both parties assumed to act under patents. The case having been set down for final hearing on the proofs and exhibits, and having been fully, learnedly and ably argued through a number of days by several counsel on both sides, Daniel Webster being of counsel for the complainant, and Rufus Choate of counsel for the defendant, the main question of law was, whether in the face of the answer, denying positively the complainant's merits, and all infringement of his patent, and praying for a trial by jury of the issues involved, the court would, under any circumstances, grant a perpetual injunction against him without a previous verdict. Another question partially mingled with a question of fact, was, what amount of prior discovery is necessary to deprive a subsequent discoverer of the merit of such originality as the law requires for the protection of a patent.

On the question of fact, the amount of prior discovery and the originality of Goodyear's results, the history of the case was essentially this. The gum called "India Rubber," long known in Eastern countries, was first introduced, it would appear, into Europe by scientific French travellers, in 1736. They analyzed it in France, but without any profitable result. It became known in this country, about 1820. In 1823, five hundred pairs of gum shoes were imported and sold at Boston. At a somewhat later date, its valuable properties were strongly believed in, and the substance itself became the subject of scientific investigation in this country. Dr. Comstock, of Hartford, Conn., discovered, about 1828, that by dissolving it in turpentine, it could be made plastic, and spread upon cloth; a discovery for which he obtained a patent. Many other persons were convinced about the same time, that it could be made an article of great domestic or social use; but none of them could ever show how. Dr. Howe manufactured it in 1829, at New York. Considerable factories of it were established soon after in different parts of New England. A factory at Roxbury began operations in 1832, was incorporated in 1833, and for some time pursued business with great apparent success. Numerous other factories, encouraged by the Roxbury factory, were in operation in 1834–5 and 6: and numbers of different articles were made there. The incurable difficulty of all these articles,—and it was a difficulty which rendered many of them entirely worthless,—was, their susceptibility to atmospheric variations of heat and cold. Exposed to warmth, they became soft, gluey and stuck together. Exposed to cold, they became perfectly rigid. All the factories failed; having produced nothing approaching the very extraordinary and valuable invention of vulcanized rubber. Notwithstanding this, there were many individuals, who were not entirely discouraged. They were deeply impressed with a belief, that gum caoutchouc was a most valuable substance, and could and would be made subservient to numerous most useful social ends. Some of these persons were more or less busy in experimenting; and many experiments were made. Some of them were senseless; some quite ingenious, and a few were in or alongside of the track of true science. Among these were the experiments of a very ingenious man, named Hayward, who, in 1838, discovered that a compound of sulphur with the gum greatly improved its qualities for some purposes, particularly that of spreading it upon cloth, the object for which he used it: and he obtained, in 1839, a patent for this discovery; which patent Goodyear afterwards bought of him. But neither Comstock's, Hayward's, nor anybody else's discoveries produced the desired compound. In 1838, the factories of India rubber goods had, with perhaps one or two exceptions where Hayward's patent was used, all come to an end.

Still after Hayward's discovery, the value of sulphur, or of kindred substances in improving the qualities of rubber, was known to many persons. The possibility of greatly increasing the value of it, by relieving the gum of its gluey nature when exposed to heat, and of its rigidity when exposed to cold, was strongly conjectured. Great numbers of experiments were made by individuals in many different and distant places,

with sulphur, with heat, and many other processes. But although many men supposed they were very near to a discovery, and, as was now testified, many professed to believe that they could and would discover the desideratum, and knew that great benefits would be produced by the use of sulphur, gum and heat; as a matter of fact, no one did or could produce the thing wanted until it was produced, complete and perfect, and was patented as his own invention by Mr. Charles Goodyear, in or about the year 1844.

Goodyear had begun experimenting in 1834; he at that date turned his attention to the precise object of clearing this gum of its stickiness, its gluey nature, its tendency to harden in the cold, and soften in the heat. He began his experiments at Philadelphia. In the spring of 1835, he removed to New York; in the summer of 1836, he went to New Haven; in the spring of 1837, to Staten Island; in the fall of 1837, he visited the almost deserted factory at Roxbury. In the summer or fall of 1838, he went to Woburn, where Hayward was trying experiments with sulphur. Here Goodyear bought the sulphur patent, and hired Hayward to assist him in his operations, and work for him a year. He went on with his experiments, and within four or five months, that is to say, in January, 1839, he made an elementary discovery of metallic or vulcanized rubber. In the fall of 1839, he carried on experiments at Lynn; and in like manner at Roxbury, in 1840; but keeping up his experiments, nevertheless, at Woburn, where his family lived.[2] In the fall of 1840, he went

to Northampton; in 1841, he removed to Springfield. His experiments were still going on at Woburn; as Hayward had come into his employment again for one year, from April, 1841. At Springfield, Goodyear continued his experiments, till he had so far perfected his invention, as to apply for a patent. This was in January, 1844. He then went to Naugatuck, in Connecticut, and started a factory, and soon after vulcanized India rubber became one of the most useful, extensive and best known products of civilized life.

The great peculiarity of the vulcanizing process may be thus stated: If you take a compound of sulphur and rubber in a dry state, and grind and mix them together, and apply heat, the consequence is, that the substance softens and softens as the heat increases, until it reaches a certain height in the thermometer, say 212° Fahrenheit. All the experimenters but Goodyear, while they knew the effect of heat to a certain extent, and knew that it was valuable in producing the compound of the gum with sulphur, yet having found that a considerable degree of heat softened and rendered it more and more plastic, were of opinion, naturally enough, that if heat were carried still higher, the whole substance would melt. They reasoned a priori, and founded their conclusions upon a general knowledge of the effect of heat. But Goodyear, as the result of untir-

---

[2] Goodyear pursued his experiments under a great deal of ridicule and reproach and at the same time in the greatest economical restrictions. These last had brought heavy debts upon him. He had a wife and several children, from whom, under the barbarous laws which then prevailed, of imprisonment for debt, he had been carried away and put in prison. In the course of the trial, an affecting letter was brought to light, written from the debtor's jail, in Boston. Here it is: "Debtor's Prison, April 21, 1840. To Mr. John Haskins or Luke Baldwin.—Gentlemen: I have the pleasure to invite you to call and see me at my lodgings, on matters of business, and to communicate with my family, and possibly to establish an India rubber factory for myself, on the spot. Do not fail to call on the receipt of this, as I feel some anxiety on account of my family. My father will probably arrange my affairs in relation to this hotel, which, after all, is perhaps as good a resting place as any this side the grave. Yours, truly, Charles Goodyear."

"I believe," said Mr. Webster, in his noble speech in this case, "that the man who sits at this table, Charles Goodyear, is to go down to posterity in the history of the arts in this country, in that great class of inventors, at the head of which stands Robert Fulton, in which class stand the names of Whitney, and of Morse, and in which class will stand 'non post longo intervallo,' the humble name of Charles Goodyear. Notwithstanding all the difficulties he encountered he went on. If there was reproach, he bore it. If poverty, he suffered under it; but he went on, and these people followed him from step to step, from 1834 to 1839, or until a later period, when his in-

vention was completed, and then they opened their eyes with astonishment. They then saw that what they had been treating with ridicule, was sublime; that what they had made the subject of reproach, was the exercise of great inventive genius; that what they had laughed at was the perseverance of a man of talent with great perceptive faculties, with indomitable perseverance and intellect and had brought out a wonder as much to their astonishment, as if another sun had risen in the hemisphere above. He says of his cell in the debtor's jail, that 'it is as good a lodging as he may expect this side the grave;' he hopes his friends will come and see him on the subject of India rubber manufacture; and then he speaks of his family and of his wife. He had but two objects, his family and his discovery. In all his distress, and in all his trials, his wife was willing to participate in his sufferings, and endure everything, and hope everything; she was willing to be poor; she was willing to go to prison, if it was necessary, when he went to prison; she was willing to share with him everything; and that was his only solace. May it please your honors, there is nothing upon the earth that can compare with the faithful attachment of a wife; no creature who for the object of her love, is so indomitable, so persevering, so ready to suffer and to die. Under the most depressing circumstances, woman's weakness becomes mighty power; her timidity becomes fearless courage; all her shrinking and sinking passes away, and her spirit acquires the firmness of marble—adamantine firmness, when circumstances drive her to put forth all her energies under the inspiration of her affections. Mr. Goodyear survived all this, and I am sure that he would go through the same suffering ten times again for the same consolation. He carried on his experiments perseveringly, and with success, and obtained a patent in 1844 for his great invention."

ing experiment, found out, that although the application of heat produced a melting effect upon this compound, rendering it more and more plastic and soft, as the degree of heat augmented, yet when that heat, going on, had got up to a certain much higher degree, its effect was the reverse of what it had been, and then the rubber composition commenced to vulcanize and harden; in fact to make metallic, the vegetable substance. And in adding to the compound of sulphur and gum used by Hayward, a carbonate or other salt, or oxide of lead, and subjecting the whole to this high degree of heat, was the distinguishing merit of Goodyear's process.

Mr. Choate, against the injunction.

No case can be produced, in which such an injunction was decreed unless on a reference by assent to the chancellor. In Bacon v. Jones (decided in 1839) 4 Mylne & C. 433, Lord Cottenham says, after a cause comes to a hearing, without a trial at law, the court may proceed and grant an injunction "although this is certainly not very likely to happen, and I am not aware of any case in which it has happened." This doctrine is thus summed up in Drewry, Inj. c. 3, § 6: "The ultimate object of a bill in equity to protect a patent is a perpetual injunction which can in general only be granted at the hearing, and it has been very lately decided that where a patentee files a bill alleging infringement and praying an account and perpetual injunction, but does not immediately or within any reasonable time apply for an interlocutory injunction, he cannot have a perpetual injunction at the hearing, if the defendant raises a question as to the validity of the title, nor will he be allowed to retain the bill with liberty to bring an action; for the court will not permit the plaintiff to delay to the hearing the trial of the legal right which he might have had at any time after filing the bill, and thus to put the defendant in a position to have a chancery suit hanging over him for years. The course the court will adopt in such a case will be to dismiss the bill with costs." In Motley v. Downman (A. D. 1837) 3 Mylne & C. 14, Lord Cottenham says: "I can hardly conceive of a case in which the court will at once interfere, by injunction, and prevent a defendant from disputing the plaintiff's legal title."

2. In this jurisdiction, chancery deals with legal and not with equitable rights. It will therefore refer to the common law to determine the existence of the right, which, when established, it will protect. Harman v. Jones, 1 Craig & P. 299.

3. The whole series of cases, both English and American, are an uniform administration of this doctrine. Dodsley v. Kinnersley (1761) Amb. 406; Baskett v. Cunningham (1762) 2 Eden, 138; Hill v. Thompson (1817) 3 Mer. 622; Sullivan v. Redfield (1825) [Case No. 13,597]; Rogers v. Abbott (1825)

[Id. 12,004]; Ogle v. Ege (1826) [Id. 10,462]; Martin v. Wright (1833) 6 Sim. 297; Bramwell v. Halcomb (1836) 3 Mylne & C. 739; Motley v. Downman (1837) Id. 14; Bacon v. Spottiswoode (1839) 1 Beav. 382; Bacon v. Jones (1839) 4 Mylne & C. 433; Collard v. Allison (1839) Id. 487; Harman v. Jones (1841) 1 Craig & P. 299; Spottiswoode v. Clarke (1846) 2 Phillips, 154; Stevens v. Keating (1847) Id. 333; and in Pidding v. Franks (1849) 1 MacN. & G. 56.

4. The answer, it is to be observed, denies entirely the validity of the complainant's patent, and his merits generally. "A denial, in answer as to the validity of the patent, or the fact of infringement, will be sufficient to entitle the defendant to further investigation in an action at law." Curt. Pat. § 340.

5. Day claims under a patent himself. Drewry (Inj. c. 3, § 4) says: "It was held in an early case, that in a conflict between parties both claiming under patents, the court could not grant an injunction till the right had been tried at law, and I am not aware of any modern decision overruling this doctrine as to a conflict between two patents." Curtis (Pat. § 339) thus confirms the rule: "It seems that where both parties claim under patents, the court cannot grant an injunction until the rights have been tried at law."

On the question of originality, the counsel then went into an analysis of the evidence showing with great labour a case, which was essentially that set forth in the statement, and arguing from it, that the discoveries of Hayward and others took from Goodyear the merit of such originality as was requisite to sustain a monopoly.

Mr. Webster, for the injunction.

1. It never was an absolute rule of law in England, that the jury trial should precede a perpetual injunction. The question whether such a trial should be ordered, has been determined according to the sound discretion of the court. Hindmarch says, in his treatise on Patents (pages 216, 356): "If no action has been tried between the parties, the court may either itself determine any question raised respecting the validity of the patent, or may send the question to a court of law to be determined, retaining the bill until the question is determined." Few v. Guppy, 1 Mylne & C. 487.

2d. The cases in England in which an injunction was refused at the hearing, were presented on the pleadings only, not on pleadings and proofs; and the court punished the plaintiff for laches, in not taking some means to have his title tried. Such is the case of Bacon v. Jones, 4 Mylne & C. 433, cited and relied on by the other side. The first sentence of Lord Cottenham's opinion confirms our view of the case. And in the course of his opinion, the chancellor says: "In this case I have not heard any reason suggested why the plain and ordinary course was not taken by the plaintiffs of previously establishing

their right at law." In another case (Wilson v. Tindal, Webst. Pat. Cas. 730) Lord Langdale says, after speaking of an interlocutory injunction: "Notwithstanding this order, the defendant may put in his answer; he may displace all affidavits which have been filed on both sides. The plaintiff and the defendant may respectively proceed to evidence; they may bring their cause on for hearing, and upon the hearing of the cause, the whole case, the law regarding the patent, and the facts which will appear upon the depositions will have to be reconsidered and that reconsideration may for any thing that can be known to the contrary, justly end in a result different from that which I have come to upon the present occasion. The defendant having his option to adopt this course of proceeding, has at the bar expressed his desire to have this matter tried at law." And he remarks: "It is not the right of parties in every case to have an action tried in a court of law; it is a question of convenience, and the court is to exercise a fair discretion."

3d. Our case is presented on the entire proofs taken by both parties in this very cause, and directed to be read in the cause by order of this court.

4th. The court has the power to determine the cause on the entire merits, and should do so unless there is either a positive rule of law, or some controlling necessity requiring aid from a jury. There is no such law or necessity. It is settled that when equity directs a trial at law, it yet has the power to disregard the finding of the jury, and proceed to decree according to its own views of the case. That covers the whole ground. If you are not obliged to regard the finding of a jury when it comes before you, then of course, it must be in discretion whether to award an issue or not. This judicature is composed of two judges. There is a mass of testimony respecting a patent-right, and an alleged violation of that patent-right. The court has listened with great patience to the reading of that evidence and to the comments upon it. We leave it with the court, thus acquainted with the evidence, seeing the entire case, to say whether it feels that its conscience needs to be enlightened as to the merits of this controversy by a trial at the bar of this court or elsewhere. Is there in this judicature a member who feels a reasonable conscientious doubt on any vital question of fact in this cause? It is proper to state it in that way because it is a question of discretion. It is not a question of right to be demanded on the one side or the other; it is a question of discretion (Harmer v. Plane, 14 Ves. 130, 131), arising after the collection of a vast body of evidence, after the promulgation of that evidence, after a final hearing of that evidence, and when the cause is ripe for decision, and a perpetual injunction, unless the court feels conscientiously that there is something affecting the right of the parties still untold, which they cannot with con-

scientious conviction settle themselves, and in regard to which they have conscientious reasons to believe a jury would enlighten them. The cases, where there is the disposition to send questions of equity to law, to be tried in the progress of an equity suit, are much less usual in our practice than in England. They are left more to the good sense of our tribunals. The necessity of expediting business, and the fact which every body knows, that a court of enlightened judges is not only as competent, but more competent to settle questions arising under the construction of a patent, so often mixed of law and facts, (for there is hardly a question that is not mixed of law and facts arising under a patent,) a combination of them leads courts not uselessly to send patents to law, to be tried by a jury.

II. There is not a single question of fact in the case we have said, on which the court can feel the least doubt. We assert that Goodyear is the first man upon whose mind the idea ever flashed, or to whose intelligence the fact ever was disclosed, that by carrying heat to a certain height it would cease to render plastic the India rubber, and begin to harden and metallize it. If there is a man in the world who found out that fact before Goodyear, who is he? Where is he? On what continent does he live? Who has heard of him? What books treat of him? What man among all the men on earth has seen him, known him, or named him? Yet it is certain that this discovery has been made. It is certain that it exists. It is certain that it is now a matter of common knowledge all over the civilized world. It is certain that ten or twelve years ago it was not knowledge. It is certain that this curious result has grown into knowledge by somebody's discovery and invention. And who is that somebody? If Goodyear did not make this discovery, who did make it? Who did make it? If the other side had endeavoured to prove that some one other than Mr. Goodyear had made this discovery, that would have been fair. But they do not meet Goodyear's claim by setting up a distinct claim of any body else. They attempt to prove that Goodyear was not the inventor, by little shreds and patches of testimony. Here a little bit of sulphur, and there a little parcel of lead; here a little degree of heat, a little hotter than would warm a man's hands, and in which a man could live for ten minutes or a quarter of an hour; and yet they never came to the point. There are birds which fly in the air, seldom lighting, but often hovering. Now this is a question not to be hovered over, not to be brooded over, and not to be dealt with as an infinitesimal quantity of small things. It is a case calling for a manly admission and a manly defence. I ask again, if there is any body else than Goodyear who made this invention, who is he? Is the discovery so plain that it might have come about by accident? It is likely to work important changes in the arts every where. It intro-

duces quite a new material into the manufacture of the arts, that material being nothing less than elastic metal. It is hard like metal, and as elastic, as pure original gum elastic. It is as great and momentous a phenomenon occurring to men in the progress of their knowledge, as it would be for a man to show that iron and gold could remain iron and gold, and yet become elastic like India rubber. It would be just such another result. Now, this fact cannot be denied; it cannot be secreted; it cannot be kept out of sight; somebody has made this invention. That is certain. Who is he? There is not in the world a human being that can stand up, and say that it is his invention, except the man who is sitting at that table. The learned counsel may prove that A. made a part, and B. made a part, and C. made a part, but A., B., C., and D., and all the rest of the alphabet disclaim this as their invention. I say, therefore, at this hour in which I have the honour to be speaking to this court, that there is not a man on the foot-stool who pretends this is his invention but one—not a man. Is that not enough? The invention exists. Every body knows and understands it, and every body connected in former times with the manufacture of India rubber has been astonished and surprised at it. There have been many respectable witnesses in this case, and the best and most intelligent of them say, after having been engaged in attempts in this manufacture for years and years, losing their time and fortunes, they never heard of or imagined any such thing, as the vulcanization of rubber until Goodyear's invention was made.

GRIER, Circuit Justice. It is true that in England the chancellor will generally not grant a final and perpetual injunction in patent cases, when the answer denies the validity of the patent, without sending the parties to law to have that question decided. But even there the rule is not absolute or universal; it is a practice founded more on convenience than necessity. It always rests on the sound discretion of the court. A trial at law is ordered by a chancellor to inform his conscience; not because either party may demand it as a right, or that a court of equity is incompetent to judge of questions of fact, or of legal titles. In the courts of the United States, the practice is by no means so general as in England, or as it would be here, if the trouble of trying issues at law devolved upon a different court.

Cases involving inquiries into the most complex and difficult questions of mechanics and philosophy, are becoming numerous in the courts. Often questions of originality, and infringement of patents, do not depend so much on the credibility of witnesses or the weight of oral testimony, as on the application of principles of science and law to admitted facts. It is true, that in matters of opinion, both mechanics and learned professors will differ widely. But still the question is not to be decided by the number, credibility, or respectability, of such witnesses; but by the force and weight of the reasons given for their respective opinions. It is no reflection on trial by jury to say, that cases frequently occur, in which ten out of twelve jurors do not understand the principles of science, mathematics, or philosophy, necessary to a correct judgment of the case. Besides, much of the time of the courts is lost, where twelve men will not agree upon any verdict; or when they have agreed, the conscience of the chancellor, instead of feeling enlightened, rejects it altogether.

A select or special jury of philosophers, if they could be got, would perhaps not prove more satisfactory or obviate the difficulty. In a late case involving the validity of Morse's telegraph patents, which was heard in Philadelphia, a final injunction was decreed without a verdict to establish the patents; and many other cases might be cited from other circuits, if necessary, in support of this practice, showing that the courts of the United States do not always consider it a proper exercise of their discretion to order such issues to be tried at law, before granting a final injunction.

In the present case there are many reasons why the court will not thus exercise their discretion: 1st. Because this case has been set down for final hearing on the exhibits and proofs, without any motion or order of the court for such an issue. 2d. After a patient hearing of very able counsel, and a careful consideration of the testimony, the court feel no doubt or difficulty on these questions, which would be removed or confirmed by a verdict. 3d. It would require three or four weeks at least, to try this case before a jury, if this library of testimony were read to them; and at least as many months, if the witnesses were examined viva voce, as they probably would be; and, after all this expenditure of time and labour, it is even more than probable, that from the confusion created by the great length of the testimony and argument in court, or the force and effect of those urged from without, no verdict would be obtained, and most certainly none that would alter the present conviction of the court.

Without requiring the aid of a jury, we shall therefore proceed to examine the questions both of fact and law, which affect the validity of the complainant's patents.

(After doing this, THE COURT concluded with the following remarks.)

The testimony shows that many persons had made experiments—that they had used sulphur, lead, and heat, before Goodyear's patents, and probably, before his discovery. But to what purpose? Their experiments ended in discovering nothing, except, perhaps, that they had ruined themselves. The great difference between them and Goodyear is, that he persisted in his experiments, and

finally succeeded in perfecting a valuable discovery, and they failed. It is usually the case, when any valuable discovery is made, or any new machine of great utility has been invented, that the attention of the public has been turned to that subject previously; and that many persons have been making researches and experiments. Philosophers and mechanicians may have, in some measure, anticipated, in their speculation, the possibility or probability of such discovery or invention; many experiments may have been unsuccessfully tried, coming very near, yet falling short of the desired result. They have produced nothing beneficial. The invention, when perfected, may truly be said to be the culminating point of many experiments, not only by the inventor, but by many others. He may have profited indirectly by the unsuccessful experiments and failures of others; but it gives them no right to claim a share of the honour or the profit of the successful inventor. It is when speculation has been reduced to practice, when experiment has resulted in discovery, and when that discovery has been perfected by patient and continued experiments—when some new compound, art, manufacture, or machine, has been thus produced, which is useful to the public, that the party making it becomes a public benefactor, and entitled to a patent.

And yet when genius and patient perseverance have at length succeeded, in spite of sneers and scoffs, in perfecting some valuable invention or discovery, how seldom is it followed by reward! Envy robs him of the honour, while speculators, swindlers, and pirates, rob him of the profits. Every unsuccessful experimenter who did, or did not, come very near making the discovery, now claims it. Every one who can invent an improvement, or vary its form, claims a right to pirate the original discovery. We need not summon Morse, or Blanchard, or Woodworth, to prove that this is the usual history of every great discovery or invention.

The present case adds another chapter to this long and uniform history. But notwithstanding the indomitable energy and perseverance with which this attempt to invalidate the patent has been pursued, the volumes of testimony with which it is oppressed, and the great ability with which it has been canvassed in the argument, we are of opinion that the defendant has signally failed in the attempt to show that himself or any other person discovered and perfected the process of manufacturing vulcanized India rubber before Goodyear. We shall give therefore our decree of perpetual injunction.

[Patent No. 3,633 was granted to C. Goodyear, June 15, 1844; reissued December 25, 1849 (No. 156). For other cases involving this patent, see note to Goodyear v. Central R. Co., Case No. 5,563.]