DAY (SELIGMAN v.) See Case No. 12,643.

---

## Case No. 3,690.

### DAY et al. v. STELLMAN et al.

[1 Fish. Pat. Cas. 487.][1]

Circuit Court. D. Maryland. July Term, 1859.

PAROL EVIDENCE TO CONSTRUE WRITING — PROVINCE OF COURT — TECHNICAL TERMS — ASSIGNMENT AND LICENSE UNDER PATENT.

1. Neither the testimony of witnesses in general, nor of professors, experts or mechanics, can be received, to prove, to the court, what is the proper or legal construction of any instrument of writing.

2. Nevertheless, the court will bring to its aid the testimony of witnesses to explain terms of art, and make itself acquainted with the material with which the writings deal, and with the circumstances under which they were made.

3. The term "shirred" means "wrinkled or contracted." The term "corrugated" means "wrinkled." These terms were known to the trade in connection with the manufacture of In-

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

dia rubber goods, prior to Goodyear's patent of March 9, 1844.

4. If a man owns two rights to manufacture goods by patents of different dates, and sells to A. his right under one specifically, and to B. the right to manufacture goods generally, as a matter of course, the fair construction of the latter grant will be held to be a conveyance of the right to manufacture under both patents.

5. A deed conveys a title, although it may have covenants in it which have not been performed. The covenant does not affect the grant; the grant passes the title, and operates in praesenti.

6. In the deeds from Goodyear to Day, the terms "shirred or corrugated goods" are not limited or restricted to goods manufactured under and in accordance with the "shirred goods" patent issued to Charles Goodyear, March 9, 1814, but they refer to and include elastic or woven rubber goods not manufactured in accordance with said patent.

This was a bill in equity, filed [by Horace H. Day, Alexander Hay, and Charles Goodyear against John Stellman, Christopher Henricks, and Henry G. Farber] to restrain the defendants from infringing upon letters patent for "improvements in the manufacture of India rubber," granted to Charles Goodyear, June 15, 1844, reissued December 25, 1849, and extended for seven years from June 15, 1858, in so far as said letters patent covered the manufacture of shirred, corrugated, or elastic rubber goods. The facts in the case were the same as are set forth in the statement of the case of Goodyear v. Cary [Case No. 5,562].

John H. B. Latrobe, for complainants.
Charles Marshall, for defendants.

GILES, District Judge. The bill was filed on the 16th of December last. It sets forth that letters patent were granted to Charles Goodyear, on June 15, 1844, for a new process of preparing India rubber for manufactures; that said patent was subsequently surrendered on account of defects in its specification; and on December 25, 1844, two new patents were granted to Goodyear: one for an improvement in felting India rubber with cotton fiber (with which we have nothing to do in this case), and the other for an improvement in processes for the manufacture of India rubber; that these two patents were for the term of fourteen years from June 15, 1844; that the commissioner of patents on June 14, 1858, after full argument, granted an extension of said patents for the term of seven years from June 15, 1858; that subsequently Goodyear, by several instruments made in 1846, sold and assigned to Day, one of the complainants, the said patents, so far as related to the preparation and manufacture of shirred or elastic India rubber goods, except in so far as the right to manufacture said goods had been parted with by Goodyear by three several licenses, viz: to Hutchinson & Runyon, Ford & Co., and Onderdonk & Letson, which said licenses were duly assigned to the said Goodyear subsequently, and by him assigned to Day.

It then sets forth that in October, 1852, Day assigned all his interest under this contract to Winslow, Syms & Gilbert; that these parties assigned it to the Congress Rubber Company, a corporation of the city of New York, and that said company in 1857, reassigned the interest to Day; so that all the interest conveyed by the contracts of 1846 are now vested in Day, except a small portion which Day parted with to his co-complainant, Hay, on October 1, 1858. The bill further sets forth that Goodyear, on May 4, 1858, conveyed to said Day, "the full, absolute and exclusive license, right, and privilege to make, use, and vend his, the said Goodyear's invention of vulcanized rubber, as described and patented in the reissued patent, granted to him December 25, 1849, for the present and all extended or renewed terms of said patent, as the same may or can be used in the manufacture of all braided, woven, cemented, or sewed fabrics, or such as are or can be covered or protected on one or both sides with substances other than rubber, and in all smooth elastic shirred goods; and also to make and sell India rubber threads of vulcanized rubber, and all threads or sheets of rubber which are or can be made or finished by union with, or to be covered by fibrous substances." It then sets forth that in 1850, Goodyear instituted suits in New Jersey, in equity and at law against Day, which were heard before the circuit court of New Jersey, in which the validity of these patents was maintained, as reported in 2 Wall. Jr. 283 [Case No. 5,569]. It further avers that the defendants in this case have violated the patent of June 15, 1844, as reissued December 25, 1849, and extended June 14, 1858, by selling large quantities of suspenders which are made of vulcanized India rubber, and are shirred or corrugated goods; and it prays an injunction and account.

The defendants, in their answer, set up as their defense, that the complainants, Day & Hay, have no title to the said patent for the purposes set forth in said bill; that by the contracts of 1846, set up in the bill and relied upon by the complainants, Goodyear, on certain conditions, granted to Day the privilege of using vulcanized India rubber in the manufacture and sale of corrugated or shirred India rubber goods, which are described in the patent of March 9, 1844; that the defendants have not since October 2, 1858, sold any corrugated or shirred India rubber goods so made under the patent of March 9; and that they have done nothing to infringe any rights held by the complainants. They admit that they have sold goods composed in part of vulcanized rubber, which the complainants have no right to manufacture and sell, but they claim that the right to manufacture such goods is vested in other parties under certain assignments from Goodyear, and they set up the contract of July 18, 1844, between Goodyear and the Naugatuck India Rubber Company, and several assignments which vested its rights in the Union India Rubber Company. Two agreements have been filed in this cause: one setting the cause down for final hearing, and arranging the terms of a decree, if the court should decide in favor of the complainants, so as to dispense with the trouble and delay of taking an account; and the other in reference to the testimony on which the case has been heard. So that the cause has been heard under these agreements on final hearing, and is now before the court for final decree.

The title of the complainants rests upon the contracts and assignments of 1846, and the deed of assignment of May 24, 1858, and the decision of this cause rests on the construction which the court may give to those instruments.

The first question under the contracts of 1846, is: What did Goodyear assign to Day by the paper of October 29, 1846, the first in the series? The complainants allege that by that paper Goodyear assigned to Day the right to manufacture all India rubber goods that were shirred, and to use in the manufacture thereof, Goodyear's invention of vulcanized rubber, as patented to him on June 15, 1844, and reissued on December 25, 1849. On the other hand, the defendants allege, that the term "shirred or corrugated goods," as used in the contracts of 1846, is limited and was intended to be limited to the goods made under the patent of March 9, 1844, and does not include any other "shirred goods" which might be made of vulcanized rubber.

The first thing which we ascertain in the examination of this contract is, that by its terms, it includes all India rubber goods that are corrugated or shirred; "shirred" being a technical term meaning "wrinkled," or "contracted." Upon the face of the paper, then, it includes all India rubber goods that are made with vulcanized rubber, and that are "wrinkled or corrugated." "Corrugated" is another term which means the same as "wrinkled," in the English language. Now, is there anything in the paper itself, in the surrounding circumstances, or in the subsequent conveyances, to narrow the broad language of the grant? Let us look at it. The grant is "the full, absolute and exclusive right, license, and privilege," to manufacture "shirred or corrugated goods." Now, the term "corrugated" is well known in the English language, and is to be found in all the dictionaries, meaning "wrinkled or contracted." But was the term "shirred" known to the trade, or to any trade prior to March 9, 1844? How stands the testimony on this point?

But, before adverting to it, the court would remark, that while the interpretation and construction of all written instruments is for the court, it nevertheless will bring to its aid the testimony of witnesses to explain terms of art, and make itself acquainted with the material with which the contracts deal, and with the circumstances under which they

were made; but neither the testimony of witnesses in general, nor of professors, experts or mechanics, can be received, to prove to the court, what is the proper or legal construction of any instrument of writing. Such evidence is inadmissible. The supreme court, in the case of Corning v. Burden, 15 How. [56 U. S.] 270, held this language: "The refusal of the court to hear the opinion of experts as to the construction of the patent, was proper. Experts may be examined as to the meaning of terms of art, on the principle of 'cuique in sua arte credendum;' but not as to the construction of written instruments." And in the case of Winans v. New York & E. R. Co., 21 How. [62 U. S.] 100, the court say: "The testimony of experts, which was rejected, had no relevancy to the facts on which the jury were to pass, but seemed rather to be intended to instruct the court on some mechanical facts, or principles, on which the court needed no instruction, or to teach them what was the true construction of the patent. Experts may be examined to explain terms of art, and the state of the art, at any given time. They may explain to the court and jury the machines, models, or drawings exhibited. They may point out the differences or identity of the mechanical devices involved in their construction. The maxim of 'cuique in sua arte credendum,' permits them to be examined as to questions of art or science peculiar to their trade or profession; but professors or mechanics cannot be received to prove to the court or jury what is the proper or legal construction of any instrument of writing. A judge may obtain information from them, if he desire it, on matters which he does not clearly comprehend, but cannot be compelled to receive their opinions as matter of evidence. Experience has shown that opposite opinions of persons professing to be experts may be obtained to any amount; and it often occurs that not only many days, but even weeks, are consumed in cross-examinations, to test the skill or knowledge of such witnesses, and the correctness of their opinions, wasting the time and wearying the patience of both court and jury, and perplexing instead of elucidating the questions involved in the issue." Greenleaf on Evidence very clearly points out the cases in which the court will bring in the aid of the testimony of witnesses to assist in construing written instruments. 2 Greenl. Ev. 282. "From the examples given in the two preceding sections, it is thus apparent that the rule excludes only parol evidence of the language of the parties, contradicting, varying, or adding to that which is contained in the written instrument; and this, because they have themselves commited to writing all which they deemed necessary to give full expression to their meaning, and because of the mischief which would result, if verbal testimony were in such cases received. It is also to be kept in mind, that though the first question in all cases of contract is one of interpretation and intention, yet the question, as we have already remarked, is not what the parties may have secretly and in fact intended, but what meaning did they intend to convey by the words they employed in the written instrument. To ascertain the meaning of these words, it is obvious that parol evidence of extraneous facts and circumstances may in some cases be admitted to a very great extent, without in any wise infringing the spirit of the rule under consideration." Also, in section 286, he says: "As it is a leading rule in regard to written instruments, that they are to be interpreted according to their subject-matter, it is obvious that parol or verbal testimony must be resorted to in order to ascertain the nature and qualities of the subject to which the instrument refers. Evidence which is calculated to explain the subject of an instrument is essentially different in its character from evidence of verbal communications respecting it. Whatever, therefore, indicates the nature of the subject is a just medium of interpretation of the language and meaning of the parties in relation to it, and is also a just foundation for giving the instrument an interpretation, when considered relatively, different from that which it would receive, if considered in the abstract." Also, in section 295, he says: "But, in resorting to usage for the meaning of particular words in a contract, a distinction is to be observed between local and technical words and other words. In regard to words which are purely technical or local—that is, words which are not of universal use, but are familiarly known and employed, either in a particular district, or in a particular science or trade—parol evidence is always receivable, to define and explain their meaning among those who use them."

With these rules in reference to parol testimony, I have looked through the whole of the testimony in this case—having read it twice very carefully—and it has left this impression upon my mind: that the term "shirred," or "shirred goods," was well known to the trade in New York prior to 1844, and that these goods were of various kinds. I think there are more than forty witnesses whose testimony bore directly on this question—some who had sold, some who had used these goods, and some who had manufactured them; and others who had imported them; and they describe the various kinds. Many of these witnesses were dealers in India rubber, and some were milliners; and their testimony was full and clear, that the term "shirred or corrugated goods" was well known prior to 1844. There is some conflict between this testimony and the testimony of some of defendants' witnesses on this point. But, in regard to many of the witnesses for the defendants, this remark will apply; that they are interested to defeat the complainants' claim: how far the court can not say; but many of them are manufacturers of those woven elastic goods

-of vulcanized rubber. Under what right they manufacture them, they do not show; but clearly, if the complainants' claim can be maintained, these parties are infringing their rights; therefore, their testimony should be received with great caution, if not entirely rejected.

Another remark will apply to a large part of the testimony of the defendants' witnesses, and it is this: that they testify that there is a marked difference between the woven elastic goods and the goods made under the patent of March 9, 1844. That is apparent to the eye, and no one denies it. The court, being satisfied that this term "shirred" was well known, endeavored, if possible, to trace it out and see where it came from. The term used in the contract is "shirred or corrugated goods." "Corrugated," as I have already remarked, is an English word well known, meaning wrinkled, and it would, therefore, read just as well "shirred or wrinkled goods." The word "corrugated" is added to explain what might otherwise be unintelligible to the un-initiated—to explain the word "shirred." It is used so, no doubt, in the patents and other instruments where it has been incorporated. I looked through all the French and English dictionaries in vain for the word "shirred." I could not find it. The nearest word I have found resembling it—and I have no doubt it comes from that—was a word in the dictionary of the Scotch language, which is "to shirp," which means to "shrivel" or "shrink up." Probably when the word crossed the Tweed and came south, they dropped the "p" and called it "shir."

We now come to the contract of October 29, 1846. What did Goodyear mean by the words "shirred goods"? Did he mean the goods manufactured under his patent of March 9, 1844, or did he mean all "shirred goods," such as were imported, and then known to the trade?

I have looked through the documentary evidence in this case to see if I could not be relieved from any conflict of testimony of witnesses by the unvarying and unde-viating record of the written instruments. Where interests are so complicated and valuable as these interests of the India rubber manufacture are, the court would repose with much greater safety on any light which it might receive from the written instruments in the cause, contemporaneous with all these contracts, or any collateral ones, than from the testimony of witnesses taken post litam motam; and the court found a piece of evidence, which was very full on that subject, in the application of Goodyear for an extension of his patent. I read from this to show that wherever Goodyear intended to limit the manufacture of "shirred goods" to his patent of March 9, 1844, he so designated it by words limiting the grant to that kind of "shirred goods."

He has given an account in the schedule attached to his application, to show what he had realized from his patent of June 15, 1844, which he was then seeking to have extended; and he says, at folio 220: "In 1844, the applicant sold to Mr. David L. Suydam the exclusive right to use his improvement in making shirred goods, for which Suydam paid $15,000." He does not say "the right to manufacture shirred goods." Had it been that language it would have been very strong for the defendants. Now we know what that exclusive right was, which was conveyed to Suydam. It was the right to manufacture goods under the patent of March 9, 1844. "About a year afterward, the applicant bought this right back from Suydam. * * * Shortly after, applicant sold three concurrent rights to make 'shirred goods,' one to John R. Ford, another to the Newark India Rubber Manufacturing Company, and a third to Onderdonk & Letson. * * * When the settlement of 1846 was made with Day, the concurrent rights were surrendered, that the shirred goods monopoly might be given to said Day." Entirely different language. And then he goes on with the different other rights he has sold, to-wit: "The right to make boots and shoes, the right to make baby-jumpers, the right to make door springs, the right to make springs for railroad cars, the right to make clothing, the right to make paper holders or bands, the right to make belting," etc. Now, unless Day owned the full and absolute monopoly, as he claims he did, to make shirred goods, no other party had it, for not a dollar was received by Goodyear from any other person according to this schedule, for manufacturing shirred goods of any description, or any article that will come under that designation. He says, Day got a monopoly of the shirred goods, and at the head of the recapitulation, he says: "For shirred goods, $24,000." Now, if Day had not the whole monopoly to make woven and sewed, as well as cemented goods, no one had it. Goodyear then ignored it when he made application for the extension of his patent. Moreover, at folio 65, after speaking of the controversies between himself and Day and the settlement in 1846, he says: "That one effect of such agreements was, to transfer to said Day, the entire right of your applicant to the manufacture of shirred goods." (Could language be more expressive than that?) "That Day paid your applicant $5.000 bonus for such right, and agreed to pay a tariff of three cents for each square yard of goods made under the same." Referring back to the contract, it will be seen that Day agreed that all goods he made should be considered as made under the contract of 1846. Then Goodyear says at folio 74: "That notwithstanding such agreement, said Day afterward proceeded to infringe anew upon the rights

of your applicant, and your applicant was obliged to commence several suits against him, among others, two in the circuit court of the United States, for the district of New Jersey, one at law and the other in equity. Such suits were pending for a long time, were severely contested, and very expensive."

Now, if we look at the bill in New Jersey we shall see what patent it was that Day was charged with infringing. In that bill, Goodyear sets forth the contest between them, Day's infringement, and the contracts of 1846; but the infringement of which Goodyear complains, is thus set forth: "Soon after said settlement and said license, said Day commenced using the improvements specified in said patents, for the preparation of India rubber for manufacturing purposes other than those permitted by his license, in violation of said patents, and made large quantities of India rubber." For what? Cemented or sewed, or woven elastic goods? No. There is not a syllable on that subject. But he says, that he made large quantities for "car-springs, packing, hose, boots and shoes, sheet-gum, paper bands, suspender ends, and other articles prepared by the use of sulphur, and also by the use of sulphur and a high degree of artificial heat." Now, the testimony in this case shows beyond all question, that Day had, all this time, been making woven elastic as well as cemented goods, and yet Goodyear complains against Day in the circuit court of New Jersey for the violation of his patents under the contracts of 1846, by manufacturing and using vulcanized rubber to make other articles than he was warranted in making under those contracts, and the articles I have just enumerated are the only ones that he specifies. He makes no complaint of his manufacturing woven or sewed elastic goods. Is it not, then, perfectly clear, that, so far as the acts of Goodyear were concerned, in none of those acts is there any indication that he meant, when he used the general term "shirred or corrugated goods," in the contracts of 1846, to limit them to the articles made under the patent of March 9, 1844? On the contrary, is there not every thing to convince the court that he meant to include all kinds of shirred or corrugated goods? In fact, does he not say—is not that the very language of his application for the extension of his patent—that he had sold that "monopoly" to Day?

If we look also at the specification in the patent of Dupont & Hyatt, it is perfectly apparent that the term "shirred" or "shirred goods" was one that was well known, and that therefore the word was no invention of Goodyear when he took out his patent. But is there anything in the patent itself of March 9, 1844, to make the use of this term "shirred or corrugated," by Goodyear, pass only the right to manufacture goods under that patent? As I have just remarked, Goodyear did not invent the word "shirred," and surely "corrugated" was a word that

he could have found in every dictionary of the English language. "Shirred," the testimony proves, was a term known and applied to an innumerable variety of goods. Does Goodyear pretend, in the patent of March 9, 1844, that he invented it? Not at all. Now let us construe the patent altogether. It is true, he says at the commencement of his specification, that I have invented a new and useful manufacture, which "I denominate corrugated or shirred India rubber goods." But look at what he really patents. Does he patent a new manufacture? What does he call it in his application to the patent office for an extension, when he speaks of having sold it to Suydam? A new "improvement." What does he say below in his claim? Does it read thus? "Having for the purpose of putting the public in possesion of my invention, fully described the nature of my manufacture, which I call shirred or corrugated goods." If that had been the language used, there would have been some force in the construction claimed by the defendants. But the language is this: "Having, etc., fully described the nature of my new manufacture of corrugated goods." Then there was a manufacture before; that is admitted. That is apparent on the face of this patent. He continues: "And having also set forth the manner in which I manufacture the same, what I claim as new therein (implying that there was something like it before), and desire to secure by letters patent, is, the forming of such goods by the stretching of strips or threads of India rubber to such extent as may be desired, and the covering of said strips on the opposite sides, with the laminae of cloth, leather, or any other suitable material, which laminae are to be united to each other, and to the threads or strips of cloth, by means of India rubber cement, the same being effected so as to produce the manufactured article such as herein set forth." Now what is his patent? It is a new process of making a manufacture that was known before. Instead of making corrugated goods by sewing or weaving, which was a dilatory process, he makes them more easily and quickly by cementing. That is what he patents—a new manufacture of corrugated goods. It was a new and useful improvement in a known manufacture, and therefore patentable by the law of 1836 [5 Stat. 117]. I hold it therefore clear, from the language of the patent, from the testimony in the cause, and from the language of Goodyear himself in his application to the commissioner of patents, that he did not intend to limit his grant in the contracts of 1846, to the goods made under the patent of March 9, 1844.

Let us now see if there is anything in the collateral testimony to show that there could have been any other intention, on the part of Goodyear, when he used these words.

In Goodyear's assignment, on September 28, 1858, to the Union India Rubber Company, there is one portion which struck my mind forcibly, in connection with this question. He goes on to say: "Now, in consideration of the premises, and of the sum of $30,000 paid to the party of the first part by the parties of the second part, the receipt whereof is hereby acknowledged, and of the tariffs herein specified, the party of the first part has granted, bargained, sold and conveyed unto the parties of the second part * * * the full, absolute, and exclusive license, right and privilege to make, use, and vend to others to be used, the invention of vulcanized India rubber, * * * so far as the same may or can be used in the manufacture of all braided, woven, cemented, or sewed fabrics, or such as are or can be covered or protected on one or both sides, with substances other than rubber, and in all smooth elastic shirred goods." I cite this for the purpose of asking this question: Why, if there were not other shirred goods made than those under the patent of March 9, did he put these words in here? Because it is admitted that Day held the right to shirred goods at this time. Does it not show that there were other shirred goods than those made under the patent of March 9, 1844? I cite it for that purpose, and that alone.

Let us now look at the three licenses referred to in the contract of 1846. The first is the license to Hutchinson & Runyon, on August 12, 1845. It conveys to them "a free license to manufacture, use, and vend shirred or corrugated goods of every description, in so far as the said Charles Goodyear may have any rights or privileges." Shirred goods of every description. Now, in the contract of October 29, 1846, between Goodyear and Day, the language is, to make, use, and vend "all shirred or corrugated goods," except so far as Goodyear has parted with the right by three licenses; therefore, it is important to ascertain what those three licenses contain. Goodyear conveys to Hutchinson & Runyon the right to use his inventions in the manufacture of shirred or corrugated goods of every description, in so far as he has a right to sell. Now, he had the right to sell his inventions, under his patents of March 9, 1844. But there are some things that he had not a right to do. He had no monopoly in woven goods made of common gum, but he could sell the right to make cemented goods of common rubber, and of vulcanized rubber, and he could sell the right to make woven goods of vulcanized rubber; and, therefore, he puts that qualification in. He says, also, in his license to Hutchinson & Runyon, that they shall pay him at the rate of ten cents per square yard for all said shirred goods which they or their assigns shall make, by or under, not the patent of 1844, but "by or under any inventions, improvements, or letters patent before mentioned." Now, can any one doubt about that construction? I have not a shadow of doubt that he intended to give to Hutchinson & Runyon, by this license, the right to manufacture all kinds of shirred goods, whether they were cemented, sewed, or woven; and to use in their manufacture his vulcanized rubber. That is the language. It could not be plainer. They are to pay Goodyear ten cents per square yard on all shirred goods which they or their assigns shall make or cause to be made "by or under any of the inventions, improvements, or letters patent before mentioned." That is to say, if Hutchinson & Runyon make woven shirred goods, of vulcanized rubber, they are bound to pay ten cents a square yard, because they are making them under the patent of June 15, 1844; for they contract to pay for all such goods that they make under any of the patents, of which this is one. I do not think the English language could be plainer. On December 9, 1846, Hutchinson & Runyon reconveyed to Goodyear this license, in general terms, for the manufacture "of shirred or corrugated India rubber goods." The license to Onderdonk & Letson was granted in September, 1845. It is also a license to manufacture, use, and vend shirred or corrugated goods of every description, in so far as Goodyear may have any rights and privileges relating thereto. It seems to be a copy of the other, and is substantially the same. This was reconveyed to Goodyear on December 1, 1846. The third license, to Ford & Co., is also in the same general language. They all seem to be copies of each other. This was reconveyed to Goodyear on December 3, 1846.

There was a reference made by the counsel for the defendants in his argument, to the release of one of those licenses by the Newark Rubber Company—the Hutchinson & Runyon license—which professes to release only the right to make the goods under the patent of March 9. The release bears no date, but was recorded on December 9, 1846; and the covenant on the part of the company is this: "And the said company covenants and agrees to and with the said Charles Goodyear, that they will not manufacture shirred or corrugated India rubber goods, in violation of the patent for said manufacture, issued to Charles Goodyear on the 9th of March, 1844." The granting part is: "Know all men by these presents, that the Newark India Rubber Manufacturing Company, in consideration of one dollar, to them paid by Charles Goodyear, has assigned to the said Charles Goodyear and his assigns, all their interest in the within instrument, and every clause, article, or thing therein contained." The assignment is, therefore, general; it is merely the covenant, that they will not manufacture shirred or corrugated goods, that refers to the patent of March 9. But it is something remarkable that on the same day they made a general release and a general covenant, as follows: "For and in consideration of one

dollar, to us in hand paid by Charles Goodyear, and in consideration of other good causes us thereunto moving, we hereby assign, transfer, and set over to said Charles Goodyear, his executors, administrators, and assigns, the within license, right, and privilege, and the assignment thereof to us, and all right granted, or intended to be granted thereby, or incidental thereto, in as full and ample a manner as we now hold and possess the same. And we also stipulate, covenant, and agree that we will not, after the 1st day of January, one thousand eight hundred and forty-seven, directly or indirectly manufacture, or be concerned in the manufacture, of shirred or corrugated India rubber goods." So it appears that, finding their error, they corrected it. One release is indorsed on the assignment, and the other on the original license.

I think, so far as I have been able to draw any inference from these licenses, that they all strengthen the conclusion to which I have arrived—that in the contract of October 29, 1846, the term "shirred or corrugated goods" meant all kinds of shirred or corrugated goods, whether cemented, woven, or sewed, and is not limited to the goods made under the patent of March 9, 1844. And this is further apparent when we look at the license to Suydam. The argument for the defendants is, that Goodyear, when he used these words in the instrument of October 29, intended only the goods made under the patent of March 9. On May 24, 1844, Goodyear sold to Suydam the right to manufacture shirred goods under the patent of March 9. The language expressly limits his right to those goods alone. It is not, "I sell the right to make shirred or corrugated goods," but it recites: "All my right, title, and interest in and to two certain patents, granted to me by the United States of America, both dated the 9th day of March, 1844, for an improvement in India rubber fabrics." Now I hold it to be very clear that if a man owns two rights to manufacture goods, by patents of different dates, and he sells to A his right under one specifically, and to B the right to manufacture the goods generally, as a matter of course the fair construction of the latter grant will be held to be a conveyance of the right to manufacture under both patents; because in the first grant, when he intends to limit it to one, he so recites on the face of the grant, and in the second, he does not.

It would be useless for me to go over all the ground so very ably occupied by the learned counsel on both sides; indeed, I am not able to do justice to it; but I hold the title of Day to be clear under the contract of October 29, 1846, to use vulcanized rubber in the manufacture of all shirred goods, whether they be cemented, sewed, or woven.

But I will say a word or two on the deed of May 24, 1858. It certainly embraces all the articles concerning which this controversy has arisen, by express terms. If not granted to Day by the contracts of 1846, they

passed by the terms of the deed of 1858. I do not speak now about the validity of it—whether it operates in praesenti or in futuro —but on its face it uses terms which will embrace these articles. It grants to Day the right to use Goodyear's invention of vulcanized rubber for the present and all extended or renewed terms of said patent, as the same may or can be used in the manufacture of all "braided, woven, cemented, or sewed fabrics, or such as are or can be covered or protected on one or both sides with substances other than rubber, and in all smooth, elastic shirred goods." Now, if Goodyear had the right to make this grant when he made it, the title would of course pass under it. Is it not a perfect deed in itself? This deed was attacked on the ground that it was not valid. But it is a deed under seal; it was given for a consideration, and it speaks in praesenti. A deed conveys a title, although it may have covenants in it which have not been performed. There are things which rest in grant and things which rest in covenant. In almost every lease or deed, if not in every one, there is something that rests in grant and something that rests in covenant. The words in this grant are: "I hereby sell, license, and convey." There it is in praesenti; it operates as a grant. Then it says: "I agree to confirm." That is a covenant for further assurance. Then it says: "I hereby authorize and empower the said Day to use my name to prosecute and defend the rights and privileges hereby granted." Then it provides: "And the terms and conditions upon which this license shall be held and enjoyed, as to bonuses, not exceeding, in the whole, the sum of thirty thousand dollars, and the tariffs, not exceeding five cents a pound on the product, shall be fixed and determined by Nathaniel Hayward and Thomas A. Jenckes, whose award in the premises shall be final, and shall be made within three months from the 15th day of June next."

Now I am not called upon to give a construction to this covenant in this deed, as to what might be its effect. But Goodyear made it, and with it he made a grant in praesenti. If the covenant fails by his laches, the grant nevertheless stands. The covenant does not affect the grant; the grant passes the title and operates in praesenti. The covenant may have become impossible by the expiration of the time, but yet the grant stands. Is not that a well known principle in the common law? If, by the expiration of time such a covenant becomes impossible, the grant stands.

But had Goodyear this right on May 24, 1858? That depends upon the construction which you give to the license of Goodyear to the Naugatuck Company on July 18, 1844. Did that license carry the right of the Naugatuck Company into the extended term of the patent of June 15, 1844?

Now, if the supreme court have decided that question, there would be an end of it.

But I do not consider that question as decided in 20 How. [61 U. S. 216]. Courts are called upon only to decide questions that are before them. A judge, sometimes, in giving an opinion uses language, which, although it is always entitled to consideration and respect, yet in reference to questions that were not before the court, and the decision of which was not necessary to the decision of the questions before it, is not of binding authority. The case in 19 How. [60 U. S. 222] was this: Day complained of the violation of the Chaffee patent by the Union Company. Of course he could not recover unless he could satisfy the court that he was the owner of that patent. The court decided that he was not the owner.

There is a point in that decision which I will read in reference to the question of the validity of the deed of 1858. In the case of Day v. Hartshorn [Case No. 3,683], the court had decided that the Chaffee patent was in Judson for the benefit of Goodyear. They speak of two contracts that Judson made, but the decision rests upon the last contract of November 12. In that case of Day v. Hartshorn, it will be found that Chaffee attempted to set aside his contracts with Judson, because the contracts had not been performed. I read from 19 How. [60 U. S.] 222, in reference to my last statement in regard to the operation of the deed of 1858: "From the terms and intent of the agreement the remedy of the breach could rest only upon the personal obligation of Judson, as by the previous one of September 6, the interest in the patent had passed to Goodyear and his licensees, and no default or act of Judson could affect them. Chaffee chose to be satisfied with the covenant of Judson, without stipulation or condition as it respected the other parties, and he must be content with it." So the court decided in that case that the Chaffee patent was in Judson for the benefit of Goodyear.

Day again complains of the Union Company for a violation of the same patent, claiming title in himself by the same instrument. The court say in this case of Day v. Union Co., 20 How. [61 U. S.] 216, "The court held in the case of Hartshorn v. Day, 19 How. [60. U. S.] 222, that under the agreement of September 5, 1850, between Judson and Chaffee, the patentee, the entire ownership in the patent, legal and equitable, passed to Judson for the benefit of Goodyear, and those holding rights under him, and on that ground decided in favor of the licensees. Now, in this case, the licenses under Goodyear, to manufacture cloth of the description claimed, are as broad and ample as were those of the defendants in the case just mentioned. Goodyear became the sole owner of the Chaffee patent as early as June 28, 1844, and on the 18th July following gave a license to the Naugatuck Company to manufacture cloths, with certain exceptions, under all his patents—those in which he was

then interested, or in which he might thereafter be interested, issued or to be issued, and also in all renewals of patents. He also gave a like extensive license, on March 28, 1847, to W. E. & John Rider, for manufacturing ships' letter and mail bags."

Now, I have a most profound respect for the learned judge who delivered this opinion; but as the case turned not upon this question, but upon other points, these licenses have to be critically examined; because it will be found on looking at the licenses referred to by the court, that they are different in language and in terms from the Naugatuck license. But what does the judge say, when he comes to the point on which the case was decided? "All these various licenses afterward became consolidated in the Union India Rubber Company, the defendants in this suit, and present therefore, a complete defense to the suit, if Goodyear was the true owner of the Chaffee-renewed patent." (And they decided that he was.) "The license of the defendants, therefore, in this case, stands upon two grounds, either of which would seem to constitute a sufficient defense to the suit for infringement: First, authority from Goodyear, the owner of the renewed term of the patent; and, second, the express recognition of Chaffee, the patentee of the right of these parties, as licensees of Goodyear, to use the improvement. And we may add to these grounds of defense, that, upon the interpretation of the court, in the case of Hartshorn v. Day [supra], of the several agreements relating to this patent, and especially that of September 5, 1850, Day took no interest in it under the assignment of Chaffee, of July 1, 1853, he having previous to that time parted with all his interest for the benefit of Goodyear and his licensees."

Those are the grounds upon which the court put it. There was no question before them about the renewed or extended term of the patent of June 15, 1844, and I presume it was never argued. It was another patent, entirely—the Chaffee patent—and the decision is put upon the ground that the complainant, Day, had no right whatever, if the patent was violated, to recover; and that was sufficient to decide that case. But the court went on and decided that the defendants had a right to the extended term of the Chaffee patent, under the license from the Naugatuck Company. Now, what is that license? "That the said Charles Goodyear, in consideration of the payments and stipulations herein provided, hath given and granted * * * unto the said Naugatuck India Rubber Company, a full and absolute license to use any and all his preparations of India rubber, and improvements in the preparation of India rubber for manufacturing cloths or any other article of merchandise, or any article to which the same may be applicable, for and during the unexpired term of all patents issued to him bearing any date whatsoever." There is a full

sentence. He gives it to them during the term of all patents issued to him bearing any date whatsoever. "And for and during the unexpired term or terms of any other patent, patents, or renewals of patents owned by him (that is, that he then owned), or in which he may have an interest, issued or to be issued." That was to cover cases where he might have had an interest in a patent which had not been issued, and the courts have decided that you can sell an interest in a patent that is to be issued.

Now read it the other way, as the counsel for the defendants would have it read. "For and during the unexpired term of all patents issued to him bearing any date whatsoever, and renewals of patents owned by him, or in which he may have an interest, issued or to be issued." You would have him using the word "issued" twice, because he has granted above, the right to the use of his patents issued to him bearing any date whatsoever, which is a full grant; and then he grants to them in a different sentence, the use "for and during the unexpired term or terms of any other patent or patents, or renewals of patents owned by him." Does not the word "renewals," in this sentence, refer to patents that were owned by him but not issued to him—because there was the Chaffee patent, which was owned by but not issued to him—or to those in which he might have an interest for the invention to be patented?

Now let us look at the license to Trotter. See the difference in the language. It is a license to use any of the "machinery, compositions, and methods of manufacturing and preparing India rubber * * * which the said party of the first part now has or may hereafter have, by virtue of any patent or patents, or otherwise, for and during the unexpired term or terms of any such patent or patents, or renewal or renewals thereof, which are or may be owned by him, or in which he may have an interest, or of which he may become possessed." That is different language entirely.

The next is the license to Riders & Trotter. This contains an express provision that it shall continue during "the unexpired term or terms of said patents, or any of them, or the renewals thereof." That, therefore, is very clear. He intended to convey whatever he did convey to them during the renewal of all patents; for he says so in express language. It is to continue during the unexpired term or terms of said patents, any of them, or the renewals thereof.

In the agreement of Goodyear with the Union Company of April 23, 1858, he speaks of the patent about to expire, and this is cited by the counsel for the defendants to show that the Naugatuck license was intended to extend into the extended term of the patent of June 15, 1844, by this agreement. Now, let us look at this a moment. It says: "That whereas the parties of the second part have certain rights and interests in the patents of the party of the first part, * * * under an agreement made by the party of the first part with the Naugatuck India Rubber Company, * * * with Jonathan Trotter, * * * with William Rider & Brothers, * * * and an agreement made by William Rider & Brothers and Jonathan Trotter; * * * and whereas the patent of the party of the first part, dated June 15, 1844, * * * is about to expire, and application has been made for an extension thereof. Now, in order to fix, define, and render certain the rights and obligations of the parties," they proceed to arrange the tariff respecting cloth when made into clothing. Now, was that made under the Naugatuck license? Not at all; but under the Trotter license. They are to pay two cents per square yard of cloth in the piece, or when made up, one and a half cents a pound on India rubber sold in sheets or otherwise, and two and a half cents a pound for other articles not herein specified. All those goods are made under the license to Riders & Trotter, and not under the Naugatuck license; so that there is no argument to be drawn, as I conceive, from that agreement of Goodyear, to show that the Naugatuck license covered the extended term of that patent.

I am, therefore, disposed to think, from this review of these instruments, and of the deed of May 24, 1858, that that deed would have conveyed an interest to Day in the articles, the infringement of which has been complained of. But it is not necessary to do so in this case. I place the title of Day on the contract of 1846; and from the best attention I have been able to give to it, I have heard nothing in the argument, and I have seen nothing in the documentary or parol evidence, to convince me that the terms "shirred or corrugated," in the contract of October 29, 1846, should be limited or restricted to the goods made under the patent of March 9, 1844.

I, therefore, will sign a decree against the defendants, restraining them, as prayed for in the bill.

[NOTE. For other cases involving this patent, see note to Goodyear v. Railroad, Case No. 5,563.

[The decision in this case was followed in the opinion of McCaleb District Judge, in Day v. Lyons, Case No. 3,684.]