WOULLUISE (GRUTACAP v.). See Case No. 5,854.

## Case No. 18,058.
### WOVEN WIRE MATTRESS CO. v. WHITTLESEY et al.
[8 Biss. 23.] [1]

Circuit Court, N. D. Illinois.   July, 1876.

PATENT—SPIRAL SPRING BED—PRIOR USE OF ARTICLE—VALIDITY OF PATENT—DESCRIPTIONS IN FOREIGN PUBLICATIONS—BEDSTEAD FRAME.

1. A claim or device for making a bed bottom of spiral coils, or wire coils interlaced or interlocked, so as to form a fabric, fastened in any form to the sides of the bedstead frame, *held* not patentable, because the same device was in general use for analogous purposes prior to the application for the patent.

2. Though it is the settled law in this country that the description in foreign publications, in order to defeat a patent in this country, should be sufficiently definite for a person of ordinary skill to construct the machine from such description in the foreign publications, yet where such descriptions are fully as definite as the specifications in the application for the patent in this country, that will be sufficient to defeat the patent.

3. The Farnham patent for a new and improved bedstead frame, sustained.

[Suit by the Woven Wire Mattress Company against John E. Whittlesey and others.]

Goodwin, Offield & Towle, for complainant.
Coburn & Thacher, for defendants.

BLODGETT, District Judge. This is a bill for injunction and damages upon an alleged infringement of patents owned by the complainant company. The patents are: First, a patent issued November 5, 1861 [No. 33,685], to Herman Stube, as assignee of O. A. A. Rouillion, for an improvement in bed bottoms, and by Stube duly assigned by legal conveyance to the complainant. The second is for a patent issued to the complainant as assignee of J. M. Farnham, dated November 30, 1869 [No. 97,375], for an improved bedstead frame.

The answer denied that Rouillion was the inventor of the improvement described in the patent of November 5, 1861, and sets forth various prior devices and prior knowledge and use of the same device, and also denies the infringement of either of the complainant's patents.

The Rouillion patent, which is the foundation of the complainant's claim, is, broadly, for making a bed bottom of spiral coils, or

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

wire coils interlocked, so as to form a fabric, fastened in any form to the sides of the bedstead frame. The patentee sets forth in his specification that he has invented a new and improved spring bed bottom. "The invention consists in constructing a bed bottom of a series of spiral springs, connected together and forming one or more layers."

The claim in the patent is "for an elastic bed bottom, constructed of a series of spiral springs interlocked or connected together to form one or more layers one over the other, and attached to a suitable frame, substantially as shown and described."

It will thus be seen that this patent is, broadly, for the device of making a bed bottom of this elastic fabric—these spiral coils interlocked or connected together so as to make a fabric. The method of fastening or adapting it to the frame forms no part of the patent, but it is, broadly, for this simple device of using this fabric for a bed bottom.

The Farnham patent is for a new and improved bedstead frame. The invention, as the inventor says, relates to a new frame for single or double bedsteads, which are provided with elastic and flexible sheets for the support of the bed, with suitable bed bottoms. The invention consists in the use of double inclined end-bars, to which the end of the fabric is clamped, and in the employment of longitudinal and adjustable standards to which the end pieces are secured. By this arrangement the fabric is securely held, and can be stretched and slackened at will.

These end pieces, it will be seen, incline so that the fabric does not rest upon the end pieces at all, but strains continuously from the point where it is fastened without binding, so to speak, across the end pieces. The end piece is beveled or sloped. The standards referred to are provided with slots, so as to permit the stretching of the fabric as occasion may require.

The patentee was allowed two claims: First. "The inclined double end-bars of the bedstead, arranged substantially as and for the purposes herein shown." Second. "The standard 'B' arranged longitudinally, and adjustable on the side-bars to the bed frame, to permit the inclined side-bars to be set a suitable distance apart, as set forth," so that by these ears or standards, as he calls them, the position of the end-bars can be changed so as to tighten the bed bottom.

It will be seen that the first patent broadly claims, as I have stated, an elastic bed bottom consisting of a series of spiral springs interlocked or connected together, and attached to a suitable frame. It does not specify any particular mode of attaching the fabric to the frame, but the idea is, a patent for using a fabric made of spiral springs interlocked or connected together for a bed bottom. The specification states that more than one thickness or layer of the fabric may be used, but that does not vary the main

feature, which is for a bed bottom formed of this elastic fabric.

The proof shows that this fabric has been known and in use in this country since 1852. In 1851 or 1852, John T. Wickersham, then of New York City, made a fabric of this kind, and used it for the bottoms and backs of chairs, and subsequently used it for the bottom or bed part of sofa beds, and that continuously, from the time this fabric was introduced by Wickersham, forward, the fabric formed by these elastic or spiral coils, interlocked so as to make a sheet or fabric, was well known in the art of wire working in this country. Mr. Wickersham, at page 25 of the defendants' testimony, says: Q. "How was this coiled wire work made?" A. "The coiled wire was wound upon a mandrel with a handle at one end of it, and four or five wires, more or less, were placed side by side and wound around the mandrel, and the mandrel turned and the wire wound around that. After the coils were completed, the coils were cut in continuous lengths, and the wires were slipped off the mandrel and separated after the coils were taken off the mandrel. After the coils were separated, the coils being in a screw shape, one coil was screwed into the other, according to the length or size of the mandrel. I experimented with machinery, but never made much progress from the hand way of making it, and gave it up as to making it with machinery."

The proof also shows that Wickersham published pamphlets or catalogues containing descriptions of his manufacture, from time to time, and also containing cuts or illustrations of chairs and sofas made of this coiled fabric, copies of which are put in evidence.

So, too, the witnesses, Thomas Robinson, and J. Armstrong, who were workmen for Wickersham, and Walker, who was subsequently a manufacturer in Philadelphia, of the same class of goods, all testify not only to the manner of the manufacture of the fabric, but also to the use of it as described by Mr. Wickersham and by Mr. Walker. So, also, Mr. Walker of Walker & Sons, Philadelphia, shows that this fabric was from 1851 or 1852 known as a fabric in the art of wire working and making of wire furniture. It had never been used exactly for a bed, but it had been used, and was used before 1861, for the making of a cot bedstead, not like complainant's exactly, because the coils were larger, but the idea was a cot bedstead of this fabric with these coils for the bed bottom. In 1851, 1852 or 1853, Wickersham made sofa bedsteads, the back and ends of which were of this fabric. One end was so adjusted that it could be let down and form part of a bed bottom, so that when this sofa was made into a bed, part of the bottom was constructed of a series of spiral springs "interlocked and connected together." So that we have the history of the art up to the time this inventor entered the field.

showing this fabric used for many analogous purposes to that of a bed bottom—that is, it was used for chair bottoms, and it was used for chair backs; it was used for cot bedsteads, and it was used for the back, ends, and part of the bottom of a sofa bedstead. At about the same time, other inventors had been experimenting to some extent, in the same direction. In 1853, Demure & Mauratz had obtained a patent for a bed bottom constructed by a combination of longitudinal and transverse wire coils, with vertical coil springs in the manner shown in the drawing attached to their patents. In 1854, one Mereweather had obtained a patent for constructing a bed bottom of bent wire—that is, wires bent into short kinks so as to give them a certain degree of elasticity and running parallel across the bottom of the bed frame, making a bed bottom of elastic material. In 1856, one Lysander Spooner obtained a patent for a bed bottom constructed of spiral coils run transversely across the frame, parallel to each other, but not interlocked; that is, he makes his coils large enough and strong enough, and puts them close enough together to bear whatever weight is intended to be borne by the bed bottom. He does not give any specific directions as to how many coils are to be used, but his plans show that they are strung across the bed transversely, nearly touching each other, but the coils are not interlocked. We have then the use of elastic coils fabric by Wickersham and Walker for purposes analogous to that called for by the Rouillion patent; then from 1853 up to 1856, other inventors had made bed bottoms of elastic wire, used longitudinally and transversely across the bedstead frame so as to make an elastic bed. They did not use the coiled wire fabric which was used by Wickersham and Walker. It will be remembered that Wickersham states that he called his furniture French furniture, because he made it like certain French furniture which had been imported about that time into this country.

This is all the evidence we have of any French device like this for the purpose of furniture. There is no evidence taken from any of the publications of France, or any evidence of any public or notorious use there. But there is evidence taken at a late stage in the history of this case, which shows that from 1855 forward, one Spyer, doing business in Berlin, Germany, made a bed bottom, which he was at that time engaged in introducing, and advertising for use in hospitals and places where sick people were being treated, made of the same interlocked woven wire—he calls it "spiral weaving," in his description, and the evidence from public documents, books and publications made in Germany in July and August, 1861, the same year that this patent was issued or applied for by Rouillion, shows that Mr. Spyer was exhibiting his invention, and making it public in every method that he could by advertising throughout Germany, showing the advantages of this kind of a bed as an invalid bed. We find in the proof various cuts and drawings, exhibitions and advertisements of it taken from German publications of that date showing that this fabric was well known and in use as a bed bottom there at that time.

We then have, so far as the Rouillion patent is concerned, what I have already said in reference to the art in this country up to the time that Rouillion entered the field, and the further facts that this fabric had been made and used in Germany, and had been described in printed publications in that country prior to the time that the Rouillion invention is claimed to have been made in this country.

The proof in the case also tends strongly to show that the idea of making and patenting this fabric in this country for the purposes of a bed bottom was suggested to Rouillion by Stube, who was Rouillion's father-in-law, and that Stube had then but lately emigrated to this country from Germany, where he might have seen the Spyer bed or published descriptions of it.

I am, therefore, fully satisfied, from the testimony in the case, that the broad claim of Rouillion in this patent for the idea of making a bed bottom of elastic wire fabric made from spiral coils interlocked with each other, can not be allowed, and that this patent for the fabric must be held void for want of novelty.

It is objected by the plaintiff, that the manufacture by Wickersham and Walker of the sofa-bed and cots was only an experiment. Both these witnesses testify that they made these cots and made the sofa bedstead, but they did not sell any. I think, perhaps, the weight of testimony shows that they sold, or gave away one. They were for sale—exposed for sale in their stores; they were publicly exhibited and advertised, but no one was inclined to buy them. I think from the proof one was used by the family in Philadelphia, for a servant's bed or cot. The use, however, was not very general. It is contended, on the part of the plaintiff, that this was, therefore, only an abandoned experiment; and, were it not for the foreign testimony in regard to the foreign use, it might be possible that the court would feel compelled to sustain the Rouillion patent upon the ground that these were mere experiments approximating towards the use which Rouillion finally adopted for this fabric; but when this testimony of Wickersham, Walker and Robinson is supplemented by the testimony of Spyer, I think there can be no doubt but this was an old art at the time of the Rouillion patent.

There is one further objection that is urged to the foreign testimony which I ought to notice, and that is, that the law requires that the description in foreign publications in

order to defeat a patent in this country should be sufficiently definite so that a person of ordinary skill could construct the machine from the descriptions in the foreign publications.

That is, undoubtedly, the settled law in this country. But it will be noticed that Mr. Rouillion gives no description of how to construct the fabric. He seems to accept the fabric as old. Spyer, in his advertisements of his bed bottom in Germany, describes it as made of "spiral weaving." It seems to me as though that is about as definite a description as the description given in the Rouillion patent of spiral coils interlocked with each other. One is "spiral weaving" and the other is "spiral coils interlocked or connected." Rouillion seems to assume that the fabric was well known, or that the method of making the fabric by interlacing or interlocking spiral coils was known, and does not deem it necessary to describe how to do that, but accepts the art as already accomplished up to that point. So, that, I think, when the writer in Germany tells us to make an elastic wire bed bottom of "spiral weaving," he has given us as good a description, and given us as much information as Rouillion did in his patent obtained in 1861.

We come now for a moment only, to the consideration of the Farnham patent. There is no evidence of any prior use of the inclined end pieces in the construction of any kind of a bed bottom, nor is there any evidence of any prior use of this standard "B"; and the evidence in this case shows conclusively that the defendants do use the inclined end pieces, and have used the standard. So far, therefore, as they have used the end piece, and the standard described in the Farnham patent, they have infringed and should be so far enjoined.

The conclusion then is, that the defendants are not liable for using the coiled wire fabric for making the bed bottom, but they do infringe so far as they use the specific elements in the frame patented by Farnham.

[For other cases involving patent No. 97,375, see Whittlesey v. Ames. 13 Fed. 893; Woven Wire Mattress Co. v. Wire Web Bed Co., 1 Fed. 222; Id., 8 Fed. 87; Woven Wire Mattress Co. v. Simmons, 7 Fed. 723; Woven Wire Mattress Co. v. Palmer, 8 Fed. 812; Hartford Woven-Wire Mattress Co. v. Peerless Wire Mattress Co., 23 Fed. 587.]